# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.G., by and through her guardian ad litem, ANGELICA GUZMAN,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW M. SAUL,[1]<br>Commissioner of Social Security,<br><br>　　　　　　Defendant. | Case No.: Case No.: 1:18-cv-00889 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF V.G. AND AGAINST DEFENDANT ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY |

V.G., by and through her guardian ad litem Angelica Guzman, asserts she is entitled to benefits under the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision denying benefits. Because the ALJ erred in addressing the lay witness testimony and rejecting the medical opinions of examining physicians, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

In September 2014, an application for benefits was filed on behalf of Plaintiff, alleging disability beginning August 1, 2011, due to "a speech or language impairment" and "a short time span to focus on things." (Doc. 11-7 at 4; Doc. 11-5 at 3) The Social Security Administration denied the

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

application at the initial level and upon reconsideration. (*See generally* Doc. 11-5) After requesting a hearing an administrative hearing, Plaintiff and her mother testified before an ALJ on April 6, 2017. (Doc. 11-4 at 5) The ALJ determined she was not disabled and issued an order on July 5, 2017. (*Id.* at 5-26) When the Appeals Council denied a request for review on April 23, 2018 (Doc. 11-3 at 2-5), the ALJ's findings became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, a minor claimant must demonstrate he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

///

**DETERMINATION OF DISABILITY**

To achieve uniform decisions, the Commissioner established a sequential three-step process for evaluating a minor claimant's alleged disability. 20 C.F.R. § 416.924(e). The process requires the ALJ to determine whether the child (1) engaged in substantial gainful activity and (2) has a severe impairments or combination of impairments (3) that met or equal one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*

The ALJ must evaluate how the child's limitations affect six broad areas of functioning called "domains" to determine whether a child's impairments functionally equal a Listing. *See* 20 C.F.R. § 416.926a. The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In evaluating these domains, an ALJ will consider how well the child "can initiate and sustain activities," how much extra help is needed, "the effects of structured or supportive settings," how the child functions in school, and the "effects of ... medications or other treatment." 20 C.F.R. § 416.926a(a). When "marked" limitations exist in two domains of functioning, or an "extreme" limitation exists in one domain, the minor claimant meets the Listing requirements. *Id*.

**A.  Teacher Assessments**

Susan Bacorn, Plaintiff's kindergarten teacher, completed a "Caregiver-Teacher Report Form" and "Teacher Questionnaire" in October 2014. (Doc. 11-8 at 62-79) Ms. Bacorn noted she had known Plaintiff for seven weeks. (*Id.* at 67) Ms. Bacorn observed that Plaintiff was "very often" easily distracted by extraneous stimuli and talked excessively. (*Id.* at 64) She indicated Plaintiff "often" had difficulty sustaining attention, would leave her seat when expected to remain in it, and interrupted others. (*Id.*) Ms. Bacorn opined Plaintiff's classroom performance was "somewhat of a problem" when it came to following directions, disrupting class, completing assignments, and Plaintiff's organizational skills. (*Id.* at 65) Ms. Bacorn believed Plaintiff had either "no problem" or a "slight problem" with the acquiring and using information domain, noting Plaintiff "had a problem at times recalling and applying previously learned materials – but not more than an average student." (*Id.* at 68) With attending and completing tasks, Ms. Bacorn noted Plaintiff would "lose focus at times, but

respond[ed] to redirection." (*Id.*) In addition, she observed that Plaintiff had no more than a slight problem with most areas of interacting and relating with others, though she identified an "obvious problem" with taking turns in conversation. (*Id.* at 70) Likewise, Ms. Bacorn believed Plaintiff had no more than slight problems with caring for herself, with the only issues being lack of patience when necessary, using coping skills to meet the demands of school, and knowing when to ask for help. (*Id.* at 72) She indicated Plaintiff did not have any problems with moving about and manipulating objects, including demonstrating straight, coordination, and dexterity. (*Id.* at 71)

In March 2017, Kristy Kennedy, Plaintiff's second grade teacher, completed a "Teacher Questionnaire" addressing the domains for minors. (Doc. 11-11 at 5-12) Ms. Kennedy noted she saw Plaintiff "6 hours a day[,] 5 days a week" and she had known Plaintiff for eight months. (*Id.* at 5) She indicated Plaintiff had "slight" problems with several activities related to acquiring and using information, including reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations, expressing ideas in writing, learning new material, recalling previously-learned material, and applying problem solving skills. (*Id.* at 6) Ms. Kennedy indicated Plaintiff had no more than slight problems with activities related to attending and completing tasks, as well as interacting and relating with others. (*Id.* at 7-8) According to Ms. Kennedy, Plaintiff did not have any problems with moving about and manipulating objects, and Plaintiff no had no problems caring for herself. (*Id.* at 9-10) She believed Plaintiff's "behavior improved with [a] new prescription." (*Id.* at 11)

**B.     Relevant Medical Opinions**

Dr. Dan Funkenstein reviewed available medical records, including therapy and education records, and completed a disability evaluation related to Plaintiff's application for benefits at the initial level on October 24, 2014. (Doc. 11-5 at 7-10) Dr. Funkenstein noted the application was for a speech and language impairment but review of the record revealed asthma and "some regression and oppositional behaviors" after her reuniting with her mother, who was incarcerated for four months. (*Id.* at 8, 9) He observed that Plaintiff was receiving speech and language therapy through Kaiser and her school, and there was "reported improvement." (*Id.* at 11) In addition, Dr. Funkenstein found the record "indicate[d] more cooperative and improving impulse control." (*Id.*) Dr. Funkenstein opined

Plaintiff had "Less Than Marked" limitations with the following domains: acquiring and using information, attending and completing tasks, interacting and relating with others, and health / physical well-being. (*Id.* at 9-10) He determined Plaintiff had no limitations with the domains of caring for herself and moving about / manipulating objects. (*Id.* at 10)

In February 2015, upon reconsideration of Plaintiff's application, Dr. Johnson reviewed the record from a psychiatry standpoint and Dr. Vaghaiwalla reviewed the record from a physical standpoint. (Doc. 11-5 at 23-24) Dr. Vaghaiwalla opined the medical record was consistent "with a severe impairment but not at [a] listing level or functional equivalent." (*Id.* at 24) Dr. Johnson also opined Plaintiff did not meet or functionally equal a listing level. (*Id.*) The physicians opined Plaintiff had "Less Than Marked" limitations with acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (*Id.* at 23-24) According to Drs. Vaghaiwalla and Johnson, Plaintiff also had no limitations with moving about/ manipulating objects and caring for herself. (*Id.* at 24)

Dr. Barbara Harrington performed a psychological evaluation on March 2, 2017, when Plaintiff was in the second grade. (Doc. 11-24 at 60, 61) The evaluation included administration of the Wechsler Intelligence Scale for Children IV ("WISC-IV") and Vineland Adaptive Behavior Scales ("VABS-II"). (*Id.* at 60) Dr. Harrington and Dr. Mark Popper observed:

> Patient's mood was neutral with flat affect. She exhibited a lack of social and emotional reciprocity. Her eye contact was poor. Her speech was normal in terms of volume, speed, and articulation. Her quantity of speech was minimal. She moved about quickly and was fidgety in the mental status interview. Patient's mother attempted to restrain Patient's behavior frequently. Patient demonstrated stereotyped and idiosyncratic sounds while doing the Coding and Symbol Search subtests.

(*Id.* at 60) Drs. Popper and Harrington determined Plaintiff "was oriented to person, however not to place, time, and situation." (*Id.*) With the WISC-IV, the physicians determined Plaintiff had a full-scale IQ of 102, verbal comprehension score of 99, perceptual reasoning score of 100, working memory score of 88, and processing speed score of 118. (*Id.* at 62) Drs. Popper and Harrington explained the full-scale score was average, working memory score was low average, and Plaintiff's processing speed was high average. (*Id.*)

With the VABS-II, Plaintiff scored in the low adaptive level with communication, daily living

skills, socialization, and adaptive behavior composite scores. (Doc. 11-24 at 63) Drs. Popper and Harrington found Plaintiff's maladaptive behavior index scores were clinically significant, explaining:

> Among the Maladaptive Behavior Critical Items were several indicators of Autism including: 1) Rocks Back and forth repeatedly, 2) Is unusually fearful of ordinary sounds, objects or situations, 3) Is obsessed with objects or activities, 4) Has strange habits (makes repetitive noises, odd hand movements), 5) Consistently prefers objects over people, 6) Uses bizarre speech, 7) Is unaware of what is happening around her. In addition, Patient has a tactile sensitivity to soap and shampoo, has speech problems and exhibits a lack of emotional and social reciprocity.

(*Id.* at 64) Dr. Harrington and Dr. Hopper gave Plaintiff a GAF score of 50[2] and recommended she receive individual therapy. (*Id.*)

Dr. David Walsh testified a medical expert at the administrative hearing on April 6, 2017. (Doc. 11-4 at 35) Dr. Walsh indicated that he reviewed Plaintiff's medical records and educational records. (*Id.* at 48) He observed Plaintiff was treated for ADHD, language delay, and an adjustment disorder. (*Id.* at 51-52) In addition, Dr. Walsh noted psychologist had diagnosed Plaintiff with "atypical autism." (*Id.* at 52) Reviewing the six domains for children, he opined Plaintiff had "less than marked" limitation with acquiring and using information, based upon her IQ scores and the questionnaires completed by Plaintiff's teachers. (*Id.* at 55-56) With the second domain of attending and completing tasks, Dr. Walsh opined Plaintiff had "less than marked" issues because she had "some skills as much as any other kid her age, but at the same time she does require prompts and a little more assistance to get it done." (*Id.* at 57) Dr. Walsh testified Plaintiff had "less than marked" limits with the "social" and "caring for oneself" domains, because she had "maintained herself in a general education classroom," despite "some impulsivity," attention problems, and frustration. (*Id.* at 57-58, 59) He believed Plaintiff had "no limitation" with moving about and relating to objects "based on medical evidence from… neurological screenings." (*Id.* at 58) Dr. Walsh declined to give an opinion on Plaintiff's health and physical well-being, reporting the physical issues, speech and language impairments were "all out of [his] domain." (*Id.* at 59)

On April 25, 2017, after the administrative hearing, Drs. Popper and Harrington completed

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

interrogatories regarding Plaintiff's level of impairment with the six domains. (Doc. 11-26 at 78-80) According to Drs. Popper and Harrington, Plaintiff had no impairment with moving about and manipulating objects. (*Id.* at 79) They indicated she had moderate limitation with the first and sixth domains of acquiring and using information, and her health and physical well-being. (*Id.* at 78-79) Drs. Popper and Harrington opined Plaintiff had marked limitations with the third and fifth domains addressing her ability to interact, relate with others, and care for herself. (*Id.* a 79) Finally, they concluded Plaintiff had an extreme impairment in the second domain of attending and completing tasks, which addressed Plaintiff's "level of alertness, ability to work at an appropriate pace, allay impulses, and initiate, sustain and change focus." (*Id.* at 78)

**C.  Lay Witness Statements**

In March 2017, several relatives of Plaintiff submitted statements regarding her physical and mental limitations and abilities. (Doc. 11-11 at 2-4, 13-17, 21)

Amalia Guzmán noted that she was Plaintiff's aunt, and Plaintiff lived with her from October 2013 to February 2014, and she continued to see her "at least once a month for about an hour," with more visits during the summer and over holidays. (Doc. 11-11 at 2) Ms. Guzmán reported Plaintiff "had trouble walking and speaking" as a toddler, and Ms. Guzmán expressed concern Plaintiff would "not eat regular food." (*Id.* at 2) Ms. Guzmán believed "something [was] wrong" with Plaintiff mentally, stating:

> I see her get upset very easily. She is in a constant negative mood when she is asked to do something. [V.G] is defiant. She "shuts down" when you try talking with her, even when you want her to eat. [V.G.] has this "habit" of cutting her hair and not sleeping at night… Although she is diagnosed with ADHD, I have seen [V.G.] very depressed and looks like a "zombie." What I mean by this is that she looks very sad, unmotivated with no interest in anything. [V.G.] looks very sad, unmotivated with no interest in anything. [V.G.] looks half asleep, lacks energy, unhappy and angry. She is almost lifeless!

(*Id.* at 2) In addition, Ms. Guzmán indicated she saw Plaintiff "struggle with reading," and Plaintiff had "a hard time concentrating and following directions." (*Id.*)

Adelina Garcia, Plaintiff's aunt, noted Plaintiff did not follow directions. (Doc. 11-11 at 3) According to Ms. Garcia, "When you told her to share her toys, she would pull them away from others. … When you tell her not to pick on her brother, she increased picking on him. When you told her to

7

listen she would be noisier and didn't pay attention. When told to do something, she would not…" (*Id.*) Ms. Garcia observed Plaintiff "seem[ed] to know the difference between taking her medicine/ not taking her medicine," and Plaintiff told Ms. Garcia that she would "get[] in trouble" for not taking the medication. (*Id.*)

Olivia Guzman noted that Plaintiff is her niece, and she was in "close contact" with her family. (Doc. 11-11 at 13) Ms. Guzman noted Plaintiff "was born premature and … suffered multiple health conditions," including asthma, environmental allergies, food allergies, ADD/ADHD, insomnia, and an eating disorder. (*Id.*) Ms. Guzman observed that Plaintiff was "unable to multi task, and… unable to finish one task before initiating another." (*Id.*) She stated Plaintiff needed instructions "repeated to her multiple times," and sometimes was "not able to follow a simple command." (*Id.*) Ms. Guzman also observed that Plaintiff could "cause bodily harm to herself, by not eating, by cutting her own hair, [and] by having selective mutism at home and school." (*Id.*) Ms. Guzman believed Plaintiff was "so much more coherent, when she is on her medications," and she exhibited improved behavior, grades, and "overall ability to do her activities of daily living at home" with the medication. (*Id.*)

Aurora Navarro, Plaintiff's aunt, noted she saw Plaintiff "about an hour or two monthly," and would sometimes babysit Plaintiff. (Doc. 11-11 at 4) She reported Plaintiff "just wouldn't eat" and had "always been very thin." (*Id.*) Ms. Navarro indicated Plaintiff's "doctor was talking about needing to use a feeding tube to feed her," but a change in medication helped and Plaintiff would "at least eat some." (*Id.*) Ms. Navarro observed that Plaintiff had a "lack of focus at times," and when talking to Plaintiff "her attention span is for a short time." (*Id.*) She explained she had to repeat things "more than once to get a response from [V.G.]," who "liked to be by herself in her own little world." (*Id.*)

Herón Guzman, Plaintiff's uncle, noted that he "visited [V.G.'s] family two or three times weekly" during the past several years. (Doc. 11-11 at 16) Mr. Guzman "noticed that [V.G.] does not listen to her mother and refuses to follow instructions." (*Id.*) He also observed that Plaintiff "cannot maintain concentration on any one task," and was "easily distracted by anything or anyone." (*Id.*) According to Mr. Guzman, Plaintiff had "a short attention span and it [was] difficult to keep her involved in a conversation." (*Id.* at 17)

Obdula Guzman Alvarado reported she was Plaintiff's aunt and saw her "at least once a month

and on holidays," but from October 2013 to February 2014, visited "every other weekend." (Doc. 11-11 at 21) She believed Plaintiff's "walking and talking were delayed in comparison to children her age." (*Id.*) Ms. Alvarado noted Plaintiff would "play by herself and talk[] to imaginary friends." (*Id.*) Further, she observed that Plaintiff had "a small appetite" and "[f]or a while she wasn't eating much," but had recently "been eating more than usual." (*Id.*) Ms. Alvarado noted she was a teacher and dealt with children with ADHD, and she saw Plaintiff exhibit the following symptoms: "Poor concentration, restless, lying, crying for no reason, poor social skills, memory problems[,] not recalling where things are and sometimes leading to an aggressive behavior." (*Id.*) Ms. Alvarado also observed that Plaintiff did not "listen when spoken to directly" and she would "fidget[] with her hands, feet and hair." (*Id.*)

**D.  Administrative Hearing Testimony**

Plaintiff testified that she was in second grade at Winchell Elementary School. (Doc. 11-4 at 40-41) She said her favorite subject was math, but she also liked to read. (*Id.* at 41) The ALJ asked Plaintiff if she could read the clock on the wall, and she responded that it was 2:15. (*Id.*) The ALJ noted the time was "actually 3:12, but that [came] out roughly the same in terms of where the hands are, just which ones are reversed." (*Id.*) Plaintiff said she could not count money, but she was learning addition and subtraction. (*Id.* at 42, 46)

She stated she was good at following directions, but only "sometimes" liked to play games with rules "[b]ecause it was too hard work." (Doc. 11-4 at 41, 43) Plaintiff stated that when the teacher said to be quiet in class, she was quiet. (*Id.* at 42) In addition, Plaintiff said she would work when the teacher said to work, stop when the teacher said to finish, and was able to do the work in the time permitted. (*Id.* at 44) Plaintiff said she cleaned her room when her mom said to clean, and she did not have any other chores at home. (*Id.* at 45)

Plaintiff testified she got ready for school by herself, including brushing her hair and brushing her teeth each day. (Doc. 11-4 at 46) Plaintiff reported she had two friends at school and she played with them at recess. (*Id.* at 42) She said she also played with her four-year-old brother, and she liked being a big sister. (*Id.* at 44)

Angelica Guzman, Plaintiff's mother, also testified at the administrative hearing. (Doc. 11-4 at 67) Ms. Guzman testified that Plaintiff was "sick often," and allergic to nuts, milk, eggs, bananas, and

animals. (*Id.* at 68-69) She said Plaintiff had an Epipen "primarily for eggs, bananas and nuts;" and she was on "a special diet at school." (*Id.* at 69) She said Plaintiff also suffered from asthma, for which she used an inhaler and nebulizer as needed. (*Id.* at 68-69)

She reported Plaintiff's medication changed in November 2016, after which Plaintiff began to pay more attention, though she would sit "fidgety." (Doc. 11-4 at 71-72) Ms. Guzman stated that Plaintiff was "more willing to do… work now but as to before she wasn't doing any of it." (*Id.* at 72) She reported there were still times Plaintiff would "shut down and not participate." (*Id.*)

Ms. Guzman also testified that her daughter did not have friends to play with, and the two friends Plaintiff said she had at school were boys, who would say "they do not like her" and "say she's weird." (Doc. 11-4 at 72-73) Ms. Guzman reported Plaintiff would only play with kids who were "younger than her, never older or the same age." (*Id.* at 73) Ms. Guzman said her daughter "tend[ed] to be a bully" with her brother, and she had to remove the door of the room her children shared because she was constantly watching to be sure Plaintiff was not pushing, grabbing, or kicking her younger brother. (*Id.* at 73-74)

Ms. Guzman said Plaintiff was "on medication to sleep because … she was going through things either cutting them up, cutting her hair, cutting something to, to keep her busy, meanwhile she was supposed to be sleeping." (Doc. 11-4 at 76) As a result, Ms. Guzman would hide the scissors from Plaintiff. (*Id.*) Ms. Guzman stated her daughter also had a history of stealing things and taking things, and she stopped taking Plaintiff to the store "because she was taking things and hiding them in her pocket." (*Id.*) Ms. Guzman took Plaintiff to a therapist and thought the issue was resolved, but Plaintiff's second grade teacher reported Plaintiff "was taking things from other classrooms when they'd go in for either art or reading." (*Id.* at 77)

According to Ms. Guzman, Plaintiff continued to have difficulties with eating. (Doc. 11-4 at 77-79) Ms. Guzman noted Plaintiff did not want to eat and she would not eat her food at school. (*Id.* at 77) She said Plaintiff gained about 20 pounds after starting a new medication, but the loss of appetite had recently returned in the past four months. (*Id.* at 77, 79) Ms. Guzman reported that Plaintiff was back to not eating and estimated she lost "maybe one or two pounds." (*Id.* at 78-79)

///

**E.     The ALJ's Findings**

Pursuant to the three-step process, the ALJ observed first that Plaintiff "was a preschooler on July 25, 2014, the date the application was filed, and [was] currently a school-age child." (Doc. 11-4 at 8)  The ALJ found Plaintiff had not engaged in substantial gainful activity since the application date. (*Id.*)  Next, the ALJ determined Plaintiff had the following severe impairments: "attention deficit-hyperactivity disorder (ADHD), atypical autism, developmental language delay, insomnia, and eating disorder." (*Id.*)

Examining the six functional domains set forth in 20 C.F.R. § 416.926, the ALJ determined Plaintiff had a "less than marked limitation" in the following domains:  acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for herself.  (Doc. 11-4 at 19, 21-22, 25)  The ALJ found she had "no limitation" in moving about and manipulating objects.  (*Id.* at 23)  Finally, the ALJ found Plaintiff had a "marked limitation in health and physical well-being." (*Id.* at 26)  Because Plaintiff did not have an impairment that resulted in "marked" limitations in two domains or "extreme" limitation in one domain, the ALJ concluded she was not disabled as defined by the Social Security Act.  (*Id.* at 26)

## DISCUSSION AND ANALYSIS

Appealing the decision of the ALJ, Plaintiff asserts that "[t]he ALJ erred by failing to follow the regulations in weighing the opinion evidence in this matter."  (Doc. 16 at 1, 14)  In particular, Plaintiff contends the ALJ "failed to evaluate and weigh the six third-party witness statements."  (*Id.* at 14)  In addition, Plaintiff contends the ALJ erred in his evaluation of the opinions from Drs. Harrington and Popper.  (*Id.*)  The Commissioner argues the Court should affirm the ALJ's decision because it "is supported by substantial evidence and is in accordance with the law."  (Doc. 19 at 11)

**A.     Lay Witness Testimony**

The ALJ must consider statements of "non-medical sources" including spouses, parents, and other relatives in determining the severity of a claimant's symptoms. 20 C.F.R. §§ 404.1513(a)(4), 416.927(c)(4); *Merrill v. Apfel,* 224 F.3d 1083, 1085 (9th Cir. 2000) ("an ALJ, in determining a claimant's disability, must give full consideration to the testimony of friends and family members").  As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects

[the claimant] is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted). To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of each witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). For example, an ALJ can reject lay witness testimony to the extent that it conflicts with other testimony, the record of the claimant's activity, and the medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

The ALJ summarized the lay witness statements and indicated, "The statements by family members were given some weight to the extent they were consistent with the medical record and medical opinion evidence of record." (Doc. 11-4 at 17) Plaintiff argues this was insufficient, because "the ALJ failed to offer any explanation as to how these statements were evaluated, and to what extent this evidence was taken into account when assessing Plaintiff's functioning in the childhood domains." (Doc. 16 at 15) Plaintiff contends the ALJ also violated "the regulations and case law directing evaluation of witness statements" because "[t]he ALJ failed to discuss what statements were accepted or rejected, and failed to set forth any reason for discounting the witness statements." (*Id.* at 15-16)

The Commissioner argues that "[t]he ALJ appropriately considered a report from Plaintiff's mother and letters from her aunts and uncle." (Doc. 19 at 11) According to the Commissioner, giving the statements "some weight to the extent they were consistent with the medical records and medical opinion evidence of record… exactly followed the regulations." (*Id.*, citing 20 C.F.R. § 416.927(c)(4); *Bayliss*, 427 F.3d at 1218) The Commissioner observes that "[t]he ALJ painstakingly summarized the record evidence, then explained in detail what evidence supported his findings on each of the six functional domains." (*Id.* at 11) The Commissioner contends the ALJ's analysis of the domains "applies with equal force to the lay witness evidence." (*Id.*)

Significantly, the Ninth Circuit determined an ALJ may not reject the statements of lay witness only upon the grounds that the "medical records did not corroborate" the symptoms alleged. *Smolen*, 80 F.3d at 1289. The Court concluded rejecting lay witness statements for this reason "violates SSR 88-13, 1899 SSR LEXIS 14 which directs the ALJ to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records." *Id.* (emphasis in original).

12

Consequently, courts have criticized the rejection of lay witness testimony on the grounds that the statements are inconsistent with the medical record, particularly where the ALJ fails to specifically identify the inconsistencies. *See, e.g.*, *Noa v. Berryhill*, 2018 WL 1696819 at *7-8 (N.D. Cal. Apr. 6, 2018) (finding error where the ALJ failed to identify what portions of the lay witness testimony was inconsistent with the medical record); *Eddy v. Colvin*, 2016 WL 11383833 at *6 (D. Or. Sept. 1, 2016) ("the Ninth Circuit has held that it is error for an ALJ to reject lay witness testimony simply because it is not corroborated by the medical record").

For example, in *Noa*, the ALJ indicated she gave "some weight" to the lay witness' "description of the claimant's activities and limitations to the extent they are consistent with the medical record and the claimant's own report of her abilities." *Id.*, 2018 WL 1696819 at *7. The Northern District determined this statement by the ALJ was insufficient, because the ALJ failed to identify the portions of the lay witness testimony that were inconsistent with the medical record, stating:

> [I]t is not clear from the ALJ's decision what descriptions she credited, and what descriptions she rejected. The medical record is more than a thousand pages long, and the ALJ does not specify what portions of [the] declaration are not consistent with the medical record. To the extent the ALJ rejected any portion of her declaration on that basis, the ALJ did not sufficiently articulate her reasons to allow this Court to conduct a meaningful review of her analysis. This was error.

*Id.*, 2018 WL 1696819 at *7. The court remanded the action, in part, with instructions for ALJ to reevaluate the weight she gave to the lay witness testimony "and provide the necessary reasoning for doing so." *Id.* at *11.

As in *Noa*, the ALJ summarized the record, including each of the lay witness statements. (Doc. 11-4 at 11-17) The ALJ then indicated only that the statements "were given some weight to the extent they were consistent with the medical record and opinion evidence of record." (*Id.* at 17) However, the ALJ did identify the portions of the lay witness statements that were inconsistent with the medical record or opinions offered by physicians. The Court is unable to speculate as to the inconsistencies the ALJ found, or the statements—or portions thereof—that the ALJ rejected. *See Noa,* 2018 WL 1696819 at *7-8; *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (the court cannot "speculate as to the grounds for the ALJ's conclusions"); *Eddy*, 2016 WL 11383833 at *7 ("while inconsistency with the medical record may be germane to lay witness testimony, simply stating the

13

testimony is inconsistent, without more, does not provide sufficient information for a reviewing court to assess the adequacy of the ALJ's finding"). Consequently, the Court finds the ALJ erred in evaluating the lay witness statements made by Plaintiff's aunts and uncle.

## B.    ALJ's Evaluation of the Medical Evidence

Plaintiff contends "the ALJ failed to apply the proper legal standards in weighing the opinion evidence." (Doc. 16 at 17) In particular, Plaintiff asserts that the ALJ erred by discounting the opinions from Drs. Harrington and Popper,[3] and giving great weight to the opinions of non-examining physicians. (*Id.* at 16-21)

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight, but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.

---

[3] Plaintiff also asserts the ALJ erred in rejecting the opinion offered by "Dr. High." (Doc. 16 at 14) However, the Court's review of the records reveals that the index entry identifying the physician who completed the interrogatories as "Dr. High" was a typographical error. Drs. Harrington and Popper also completed the interrogatories, as indicated in the signature lines. (*See* Doc. 11-24 at 60-64; Doc. 11-26 at 80) Thus, both the challenged opinions in this action were offered by Drs. Harrington and Popper, in March 2017 and April 2017.

14

1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Because the opinions of Drs. Harrington and Popper conflicted with the opinions of each of the non-examining physicians who reviewed the record, the ALJ was required to identify "specific and legitimate" reasons for rejecting the level of impairments identified by Drs. Harrington and Popper. *See Lester*, 81 F.3d at 830-31.

The ALJ summarized the entirety of the record—including the medical opinions, school records, and lay witness testimony—and explained the weight given to the medical opinions as follows:

> On April 25, 2017, after completion of a psychological evaluation, consultative psychologists Dr. Harrington and Dr. Popper opined that the claimant had moderate impairment in acquiring and using information, extreme impairment in attending and completing tasks, marked impairment in interacting and relating with others, no impairment in moving about and manipulating objects, marked impairment in the ability to care for self, and moderate impairment in health and physical well-being (Exhibit 20F). This opinion was given little weight because the severe limitations given were inconsistent with the medical record, objective medical evidence, and medical opinion evidence of record.

(Doc. 18-4 at 17) In addition, the ALJ addressed some findings of Drs. Harrington and Popper from the consultative examination, stating:

> On the VABS-II, the claimant achieved a low adaptive level in daily living skills with a percentile rank of .1 (Exhibits 14F, pp. 5-6). This evidence was given no weight because it was inconsistent with the medical record and overall evidence. For example, Ms. Guzman reported that the claimant's ability to care for herself was not limited (Exhibit 2E, p. 7). Kindergarten teacher Ms. Bacorn indicated that the claimant had no difficulty caring for herself (Exhibit 6E). Second grade teacher Ms. Kennedy indicated that the claimant had no difficulty caring for herself (Exhibit 19E).

(*Id.* at 25)

Plaintiff contends with these statements, the ALJ failed to properly evaluate the medical opinions of record. (Doc. 16 at 17-18, 20-21) According to Plaintiff, the ALJ "failed to properly analyze" the opinions offered in the interrogatories by failing to "reference any specific evidence in the medical record which contradicts the opinion." (*Id.* at 21)

In response, the Commissioner contends, "The ALJ properly rejected the opinion of consultative examiners Drs. Harrington and Popper that supported Plaintiff's disability claim but contradicted all five of the remaining medical opinions." (Doc. 19 at 5) The Commissioner argues that "[t]he ALJ extensively reviewed the record evidence… and then explained his findings in each of the

six functional domains." (*Id.,* citation omitted) According to the Commissioner, the ALJ did not err in rejecting the examining physicians' opinions as "inconsistent with the medical record, the objective evidence, and the other medical opinions in the record." (*Id.*)

Significantly, the Ninth Circuit determined an ALJ may reject the opinions of a physician where the opinions are inconsistent with the overall record. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, to reject an opinion as inconsistent with the physician's notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). To reject an opinion as contradicted by the medical record, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and mak[e] findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey*, 849 F.2d at 421-22.

The ALJ reviewed the interrogatories completed by Drs. Harrington and Popper in April 2017—which addressed each of the six domains— and concluded "the severe limitations given were inconsistent with the medical record, objective medical evidence, and medical opinion evidence of record." (Doc. 11-4 at 17) Specifically, Drs. Popper and Harrington opined Plaintiff had moderate limitation with the first and sixth domains of acquiring and using information, and her health and physical well-being; marked limitations with the third and fifth domains addressing her ability to interact, relate with others, and care for herself; and an extreme impairment in the second domain of attending and completing tasks, which addressed Plaintiff's "level of alertness, ability to work at an appropriate pace, allay impulses, and initiate, sustain and change focus." (Doc. 11-26 at 78-79) However, the ALJ failed to identify which of the conclusions on the interrogatories that he rejected as inconsistent with the medical record, or to identify conflicting clinical evidence. Instead, the ALJ offered only his conclusion that the opinions in the interrogatories conflicted with the record, which is insufficient. *See Magallanes*, 881 F.2d at 751; *see also Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (the ALJ has a burden to "set out a detailed and thorough summary of the facts and

16

conflicting clinical evidence, stating his interpretation thereof, and making findings"). Thus, the ALJ erred in his rejection of the opinions offered by Drs. Harrington and Popper in April 2017.

**C.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ erred in evaluating the statements of lay witnesses in this action and explaining the extent to which the statements were accepted and rejected. In addition, the ALJ failed to identify legally sufficient reasons for rejecting the limitations assessed by Drs. Harrington and Popper.

The Court cannot conclude the ALJ's errors were harmless, because a finding that V.G. had the limitations in the domains identified by Drs. Harrington and Popper would mandate a finding that V.G. is disabled. *See* 20 C.F.R. § 416.926a(a). Therefore, the matter should be remanded for the ALJ to re-evaluate the lay witness statements and medical evidence. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because remand is appropriate due to the ALJ's flawed analysis related to the lay witness statements and the interrogatories completed by the examining physicians, the Court declines to address the remaining arguments raised by Plaintiff in the opening brief. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff V.G., by and through her guardian ad litem Angelica Guzman, and against Defendant, Andrew Saul, the Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **September 23, 2019**  **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE